## ECTOR *v.* GRANT, administrator.

In the distribution of the estate of an intestate a first cousin of the half-blood on the maternal side will take the estate in preference to a second cousin of the whole blood.

Argued January 11, — Decided January 24, 1901.

Appeal. Before Judge Candler. DeKalb superior court. March 30, 1900.

*King & Anderson* and *Lewis W. Thomas,* for plaintiff in error. *Rosser & Carter* and *Thomas J. Ripley,* contra.

COBB, J. E. L. Grant, as administrator of Frank M. Ector, applied to the ordinary for leave to sell land belonging to the estate of his intestate. Benton B. Ector, who claimed to be the sole heir of Frank M. Ector, filed a caveat to this application, upon grounds not necessary to be referred to in the discussion which will follow. The case was appealed to the superior court, and at the trial there it was held that Benton B. Ector was not an heir at law of the intestate, and the caveat was overruled. The claimants to the estate were Benton B. Ector on the one side, and E. L. Grant and his brothers and sisters on the other. According to an agreement which is contained in the record, the relationship of the different claimants to the intestate was as follows: The grandmother of the children of Augustus Grant (the claimants), on their father's side, was married twice. The first time she married a Grant. By this marriage Augustus Grant, the father of the children now claiming the property in dispute, was born. The husband of their grandmother died, and the widow Grant afterwards married Wily B. Ector. By this marriage there was born Eleanor Ector, who married her first cousin Richard Ector. By this marriage there was born Frank M. Ector, the deceased, so that the mother of Frank M. Ector was the half-sister of the father of the Grant claimants. Joseph Ector, the great-grandfather of Frank M. Ector, had three sons, Hugh Ector, Wily B. Ector, and Joseph Ector, Jr. Hugh married, and by this marriage there was issue, Benton B. Ector, the caveator in this case. Wily B. Ector married the widow Grant, who was the grandmother of the Grant children claiming the estate. By this marriage Eleanor Ector was born. Joseph Ector Jr. had a son, Richard Ector. Richard Ector married his first cousin Eleanor Ector, and by this marriage Frank M. Ector, the deceased, was born. It was thus admitted that Benton B. Ector, the caveator, was a first cousin to both the mother and father of Frank M. Ector, the deceased. It was admitted that the deceased, Frank M. Ector, died intestate without wife, children, brothers or sisters, or descendants thereof, and without mother or father, uncle or aunt, surviving him; that on the Grant side there were no other living kin as near in degree as Ed. L. Grant and his brothers and sisters, and on the Ector side no other living kin as near in degree as Benton B. Ector, unless his nieces and nephews, several of whom were alive, would be entitled to be treated on an equality with him. It will thus be seen that the question to be determined in the pres-

ent case is, when an intestate leaves surviving him no widow, descendant, ascendant, brother or sister, or representative of either, who is entitled to inherit the estate, a second cousin of the whole blood, or a first cousin of the half-blood on the maternal side ?

At common law the half-blood could not inherit land.   The rule prevailing at the time Sir William Blackstone wrote is thus stated by him:   "The heir need not be nearest kinsman absolutely, but only *sub modo;* that is, he must be the nearest kinsman of the *whole* blood; for, if there be a much nearer kinsman of the *half-*blood, a distant kinsman of the whole blood shall be admitted, and the other entirely excluded.   Nay the estate shall escheat to the lord sooner than the half-blood shall inherit."   2 Bl. Com. mar. p. 227.   This rule was the outgrowth of the feudal doctrine, that descent must be traced from the first purchaser.   "The half-blood," says Chancellor Kent, in his Commentaries, "was, until lately, entirely excluded by the English law, on the very artificial rule of evidence, that the person who is of the whole blood to the person last seized affords the best presumptive proof that he is of the blood of the first feudatory or purchaser.   Our American laws of descent would seem to be founded on more reasonable principles.   The English rule of evidence may be well fitted to the case to which it is applied; but the necessity or policy of searching out the first purchaser is to be questioned, so long as the last owner of the estate, and the proximity of blood to him, are ascertained."   4 Kent's Com. (14th ed.) *403.   Dr. Minor, in his Institutes (vol. 2, p. 529), after stating that as a kinsman of the half-blood has but one half his ancestors above the common stock, the same as those of the propositus, and therefore there is not the same probability of that requisite of the common law, that he be derived from the blood of the first purchaser, says:   "This is doubtless the best reason that can be given for this exclusion of the half-blood, but it must be admitted to be very far from satisfactory.   In the first place, it does not justify the peremptory and total exclusion of the half-blood, but only its postponement; and next, it neglects the obvious consideration, that there is or may be a greater probability that a nearer kinsman of the half-blood is derived from the blood of the first purchaser, than a more remote kinsman of the whole blood."   Sir William Blackstone admits that the rule has been the subject of many censures, but declares that this arose out of a misapprehension of the rule, which,

he says, is not to be regarded so much as a rule of descent but as a rule of evidence; and he enters in his Commentaries into an elaborate defense of the rule. See 2 Bl. Com. mar. p. 228 et seq. Mr. Hammond, in his notes to the Commentaries of Blackstone, says: "The exclusion of the half-blood seems to rest upon a notion of relationship quite different from any we now entertain, but which is by no means unreasonable, if we rightly comprehend it." 2 Hammond's Black. top p. 374.

As the personal estate of an intestate was not required to descend to one who was of the blood of the first purchaser, it would seem that the rule excluding the half-blood would not be applicable to that character of property. While there are some contradictory decisions on this subject by the English courts, it was definitely settled in Crook *v.* Watts, 2 Vern. 124, decided in 1690, that brothers and sisters of the half-blood have an equal claim to personal property with those of the whole blood. See 24 Am. & Eng. Enc. L. (1st ed.) 376, and cases cited in note 1. "Prior to the novels of Justinian, the civil law admitted the half-blood to the inheritance equally with the whole blood; but the novel, or ordinance, of Justinian changed the Roman law, and admitted the half-blood only upon failure of the whole blood." 4 Kent's Com. (14th ed.) *406. By the statute 22 and 23 Charles II, chap. 10 (Watkins' Dig. p. 16), it was enacted that the estates of intestates, except feme coverts, should be distributed in the following manner: One third to the widow, and the residue in equal portions to the children, — if dead, to their descendants. If there were no children or lineal descendants of such, then a moiety to the widow, and a moiety to the next of kin in equal degree. If there were neither wife nor children, then the estate was to be distributed among the next of kin in equal degree and their descendants, but no representation was allowed among collaterals farther than the children of the intestate's brothers and sisters. The nearness or propinquity of degree was to be reckoned according to the computation of the civilians; and not of the canonists, which the law of England adopts in the descent of real estates. 2 Bl. Com. 515, 504. The half-blood was not in terms excluded by this act.

It may be safely assumed that at the date the Colony of Georgia was settled the half-blood, under the law of England, could not inherit land, and that there was no law excluding such from a share

in the personal property of intestates' estates. If this rule was ever changed by any authority authorized to make laws for the Colony, our attention has not been called to such a law, nor have we been able to find in any book accessible to us any legislation on the subject during the time of the Colony. The only book containing colonial laws which is accessible to us is a compilation by De Renne, published under the supervision of Charles C. Jones, containing laws passed from 1755 to 1774; and, after a careful examination of this compilation, we feel safe in saying that there is nothing in relation to this subject in the same. The question now to be determined is, what changes have been made in these rules since the independence of the Colony? The first constitution of the State, adopted on February 5, 1777, declared: "Estates shall not be entailed; and when a person dies intestate, his or her estate shall be divided equally among their children; the widow shall have a child's share, or her dower, at her option; all other intestates' estates to be divided according to the act of distribution, made in the reign of Charles the second, unless otherwise altered by any future act of the legislature." Watkins' Dig. 15; Mar. & Craw. Dig. 12. On February 25, 1784, an act was passed declaring that all laws which were in force and binding upon the inhabitants of the colony on the 14th day of May, 1776, "so far as they are not contrary to the constitution, laws, and form of government now established in this State, shall be, and are hereby declared to be, in full force, virtue, and effect, and binding on the inhabitants of this State." "And also the common law of England and such of the statute laws as were usually in force in the said province, except as before excepted." Wat. Dig. 289–290. The constitution of 1789 declared: "Estates shall not be entailed; and when a person dies intestate, leaving a wife and children, the wife shall have a child's share, or her dower, at her option; if there be no wife, the estate shall be equally divided among the children, and their legal representatives of the first degree. The distribution of all other intestate estates may be regulated by law." Con. 1789, art. 4, sec. 6, Wat. Dig. 29.

On December 23, 1789, an act was passed which declared: "That the true construction of the sixth section of the fourth article of the constitution shall and is hereby declared to be as follows: When any person holding real and personal estate shall depart this

life, intestate and without will, the said estate, real and personal, shall be considered as altogether of the same nature, and upon the same footing; so that in case of there being a widow and children, or child, they shall draw equal shares thereof, unless the widow shall prefer her dower; in which event she shall have nothing further out of the real estate than such dower; but shall nevertheless receive her proportionable part or share out of the personal estate. In case any of the children shall have died before the intestate, their lineal descendants shall stand in their place and stead; in case of there being a widow and no child or children, or legal representatives of children, then the widow shall draw a moiety of the estate, and the other moiety shall go to the next of kin in equal degree and their representatives. If no widow, the whole shall go to the child or children. If neither widow, child, or children, the whole shall be distributed among the next of kin in the equal degree, and their representatives; but no representatives shall be admitted among collaterals further than the child or children of the intestate's brothers and sisters. If the father or mother be alive, and a child dies intestate, and without issue, such father (or the mother, in case the father be dead, and not otherwise) shall come in on the same footing as a brother or sister would do. The next of kin shall be in- vestigated by the following rules of consanguinity, that is to say, children shall be nearest; parents, brothers and sisters shall be equal in respect to distribution, and cousins shall be next to them. The half-blood shall be admitted to a distributive share of the real and personal estate in common with the full blood." It was further provided in the act, that "should any case arise, which is not expressly provided for by this act, respecting intestate estates; the same shall be referred to and determined by the common law of this land, as it hath stood since the first settlement of this State, except only, that real and personal estate shall be considered, in respect to such distribution, as being precisely on the same footing." Wat. Dig. 414; Mar. & Cr. Dig. 216.

The above-quoted provisions of the constitutions of 1777 and 1789 seem to be substantially the same. The word "entail," as used in these provisions, would indicate that the framers of these instruments had in mind the intention to change those rules of the English law relating to real estate by which this class of property could be made the subject of an entailed estate; and it has been

sought to construe the section in each constitution as relating exclusively to this class of property. Taking each section, however, as a whole, and in the light of the circumstances surrounding the framers of the two constitutions, we think that the term "estate," at least when used the second time, was intended to be used in its broad sense, to include both realty and personalty. The fact that in each instance the manner of distribution is similar to that provided by the English law in cases of personal estates is an indication that the word "estate" is to be given the broad meaning above referred to. The English rule which provided that the land should descend to the eldest son was not satisfactory to the framers of the constitution, and the purpose of the provision on the subject was to abolish this rule, and provide that all children should inherit alike, at the same time making provision for the widow, giving her the right to take her dower in land, which she had under the English law, or a child's share, at her option. This rule as to realty being abolished, the manner in which the realty was to be divided was practically the same as that provided by the statute of Charles II; and as the constitution of 1777 distinctly provided that the estates of other intestates than those referred to in the constitution were to be divided according to the statute of distributions passed in the reign of Charles II, and this statute referred to personal estate exclusively, it is not unreasonable to presume that the framers of the constitution intended to lay down the rule applicable to both classes of property. If this construction of the constitutional provision of 1789 is correct, then the act of 1789, which purports to construe the constitution, is not subject to the criticism that a constitutional provision can not be construed by legislative enactment so as to bind the courts, for the reason that the act of 1789 appears to be declaratory of existing law, and not a construction of the section. The statute of Charles II became a part of the law of Georgia by virtue of the adopting act of 1784, and certainly the act of 1789, so far as its provisions are consistent with this statute, is merely a declaratory statute. If, however, there is any material difference between the act of 1789 and the statute of Charles II in any particular, there is certainly none so far as the rights of the half-blood are concerned. The half-blood was entitled to inherit, under the statute of Charles II, equally with the whole blood. See Crook v. Watts, supra. The constitution of 1798 did not refer in terms to the sub-

ject of distribution of estates, but it contained a provision that "all laws now enforced shall continue to operate, so far as they are compatible with this constitution, until repealed." Wat. Dig. 42; Mar. & Craw. Dig. 31.

By an act passed in 1804 it was provided that, "when any person holding real or personal estate shall depart this life intestate, the said estate, real and personal, shall be considered as altogether of the same nature, and upon the same footing." If the intestate leaves a widow and child or children, they shall share equally in the estate, unless the widow elects to take dower, when she shall have nothing out of the realty, but shall have a child's part of the personalty. If any child should die before the intestate, the lineal descendants of such child shall stand in his place. In case there is a widow and no child, or representatives of a child, the widow shall have a moiety of the estate, and the other moiety shall go to the next of kin, in equal degree, and their representatives. If children and no widow, the whole estate shall go to the children. If neither widow nor child, or legal representative of a child, the whole estate shall be distributed among the next of kin, in equal degree, and their representatives; but no representation shall be admitted among collaterals further than the child or children of intestate's brothers and sisters. If the father or mother be alive, the father, or, if he be dead, the mother, shall come in on the same footing as brothers and sisters. In case the mother intermarried, or in case the intestate be the last child, the mother shall not take any part in the estate, but the same shall vest in the next of kin on the father's side. "And in case a person dying without issue, leaving brothers or sisters, of the whole and half-blood, then the brothers and sisters of the whole and the half-blood, in the paternal line only, shall inherit equally; but if there shall be no brother or sister, or issue of brother or sister of the whole or half-blood in the paternal line, then those of the half-blood, and their issue in the maternal line, shall inherit. The next of kin shall be investigated by the following rules of consanguinity: viz. Children shall be nearest; parents, brothers, and sisters shall be equal in respect to distribution; and cousins shall be next to them." Prince's Dig. 233; Cobb's Dig. 291; Clayton's Dig. 193. By an act approved December 14, 1859, the act of 1804 was so amended as to provide that representation among collaterals should extend to the child or

children of intestates' nieces and nephews, but not further.    Acts 1859, p. 35.

The provisions of the Code of 1863 with reference to distribution of estates are substantially the same as those contained in section 3355 of the Civil Code.   See Code 1863, § 2452.   There have been some amendments since the Code of 1863, but none which are material to the present discussion.    The section of the Civil Code provides, substantially, as follows:   When the husband dies without issue, the wife is the sole heir.    If there are children, or those representing deceased children, the wife has a child's part, unless the shares exceed five, when she has one fifth of the estate.    If she elects to take dower, she has no further interest in the realty. Children stand in the first degree, and lineal descendants of children stand in the place of their deceased parents; and in all cases of inheritance from a lineal ancestor, the distribution is per stirpes and not per capita.    The fifth paragraph of the section is in the following language: "Brothers and sisters of the intestate stand in the second degree, and inherit, if there is no widow, or child, or representative of child.    The half-blood on the paternal side inherit equally with the whole blood.    If there be no brother or sister of the whole or half-blood on the paternal side, then those of the half-blood on the maternal side shall inherit.    The children or grandchildren of brothers and sisters deceased shall represent and stand in the place of their deceased parents, but there shall be no representation further than this among collaterals."    The father inherits equally with brothers and sisters and stands in the same degree. If there be no father, and the mother is alive, she shall inherit in the same manner as the father would.    In all degrees more remote than the foregoing, the paternal and maternal next of kin shall stand on an equal footing.    First cousins stand next in degree; uncles and aunts inherit equally with cousins.    Paragraph nine of the section is the following language: "The more remote degrees shall be determined by the rules of the canon law as adopted and enforced in the English courts prior to the 4th day of July, A. D. 1776."    It will be seen that the provisions of the code in reference to the right of the half-blood to inherit are substantially the same as those contained in the act of 1804.    Of that act Judge Lumpkin, in *Redd* v. *Clopton*, 17 *Ga.* 232, said: "This act of distribution, it will be perceived, is almost a literal transcript of the English statute

of 22 and 23 Charles II, which was borrowed from the 118th Novel of Justinian." It was held in the case just cited that the word "cousins," used in the act of 1804, embraced "all cousins, maternal as well as paternal."

It is contended that the half-blood on the maternal side can not inherit in this State as long as there is any person living who is either of the whole blood or the half-blood on the paternal side. We do not think this a proper construction of this section. If there is a brother or sister, either of the whole blood, or of the half blood on the paternal side, either would take in preference to a brother or sister of the half-blood on the maternal side. Or if there is a child or grandchild of a brother or sister, either of the whole blood, or of the half-blood in the paternal line, such child or grandchild would by representation take the place of the deceased ancestor, and become entitled, in preference to a brother or sister of the half-blood in the maternal line. But if the relatives of the whole blood, or of the half-blood on the paternal side, are farther removed from the intestate than grandchildren of brother or sister, then the half-blood on the maternal side is allowed to come in competition with them for the inheritance; and which shall inherit in such a case—the remote descendant of the whole blood, the remote descendant of the half-blood on the paternal side, or the brother or sister of the half-blood on the maternal side, or descendant of such, is determined by ascertaining which stands nearest in degree to the intestate. And in determining this question, representation is allowed to the descendants of the half-blood on the maternal side to the same extent as it is allowed in other cases of collaterals, that is, to grandchildren. Paragraph five of the section of the code above cited provides simply when the half-blood on the maternal side shall be allowed to come in, and does not undertake to determine the degree of relationship when those claiming the estate are farther removed from the intestate than grandchildren of brother or sister. Nothing in the section provides the degree in which cousins other than first cousins shall stand. The rule to be followed in determining the relationship of cousins other than first cousins is found in paragraph nine of the section. The rule appears for the first time in our law in the Code of 1863. In *Wetter* v. *Habersham*, 60 *Ga.* 193, it was held that if a person dies intestate, leaving no descendants or next of kin within the degrees expressly named in the code,

the heirs at law are those nearest in blood to the intestate, to be ascertained according to the rules, not of the civil, but of the canon law, that is, counting from the intestate up to the common ancestor, one degree for each generation, thence down the collateral line to the contestant. The number of degrees in the longer of these two lines is the degree of kindred between the intestate and the contestant. See also the case of *Short* v. *Mathis,* 101 *Ga.* 287, where this rule was applied. If we apply this rule to the present case, we find that Joseph Ector was the common ancestor of Frank M. Ector and Benton B. Ector, that Frank M. Ector was removed three degrees from the common ancestor, and that Benton B. Ector was removed two degrees. Therefore they were related to each other in the third degree. The common ancestor of Frank M. Ector and Ed. L. Grant and his brothers and sisters is the wife of Wily B. Ector. Frank M. Ector is two degrees removed from the common ancestor, and the Grant children are two degrees removed from the common ancestor. The Grant children are, therefore, related to Frank M. Ector within the second degree; and, being one degree nearer than Benton B. Ector, are entitled to inherit in preference to him.

It is contended, however, that because paragraph nine of the section of the code above referred to adopts the rule of the canon law, this is an indication that it was the intention of the legislature to keep in force all the provisions of the canon law in reference to inheritance, where a contrary rule was not expressly laid down in the statute. We do not think this position is sound. The rule of the canon law is referred to for no other purpose than to provide a method of counting the remote degrees of relationship. Under the very terms of the statute, it is not to be looked to for any other purpose. It furnishes simply the method of counting the degrees of relationship in those cases where the degrees are not fixed in the preceding paragraph of the section. But even if this is not true, the rights of the half-blood are, in our opinion, expressly provided for in the preceding paragraphs of the section, and this express provision must overcome any implication to be drawn from the ninth paragraph. The rule of the common law excluding the half-blood has never met with favor in this country; and while the laws of the different States are far from uniform on this subject, there is hardly a State in the Union where the half-blood is not entitled to some

rights in the matter of inheritance.    See 4 Kent's Com. (14th ed.) *403 et seq.; 24 Am. & Eng. Enc. L. (1st ed.) 369 et seq.    Even in England the harsh rule of the common law has been changed by statutes, some passed in the reign of William IV, and others during the reign of the late Queen Victoria.    Kinsmen of the half-blood are no longer excluded, but only postponed; the effect of the changes in the law being to require the collateral kinsman who is to succeed, whether of the whole or half-blood, to trace his descent from the last purchaser; or if his heirs have failed, and where the land is descendible as if an ancestor had been the purchaser thereof, if his heirs have also failed, then from the person last entitled to the land.    2 Minor's Institutes, 529.    The reason upon which the rule excluding the half-blood was founded was never applicable in this State; and he who desires to exclude the half-blood from the inheritance must show a provision of law having this effect.    He was entitled to a share of the personal estate under the English act of distributions.    The earliest expression of our lawmakers on the subject was an effort to abolish the hardships and inequalities of the English rules of descent as to realty, and to adopt the more reasonable rules of inheritance derived from the statutes providing for the distribution of the personal estate; and the only expression to be found in our laws at the present time prejudicial to the half-blood are those above referred to, which under certain conditions postpone the half-blood on the maternal side to the whole blood or half-blood on the paternal side.

As we have reached the conclusion that Benton B. Ector was not an heir at law of Frank M. Ector, it is unnecessary to determine the question as to whether the former's nieces and nephews are related to Frank M. Ector in the same degree as himself.    This question is made in the record, but, under the view we have taken of the case, it is not necessary to decide it.    The degrees of relationship between the persons who are interested in the present case and the intestate will fully appear from the diagram which follows this opinion.

*Judgment affirmed.    All the Justices concurring.*